388 S.E.2d 308

**4–H ROAD COMMUNITY ASSOCIATION**

v.

**WEST VIRGINIA UNIVERSITY FOUNDATION, INC.**

**No. 18858.**

Supreme Court of Appeals of West Virginia.

Dec. 20, 1989.

Tom Rodd, Morgantown, for 4–H Road Community Ass'n.

J. Robert Gwynne, Irene M. Keely, Morgantown, for W. Va. University Foundation, Inc.

PER CURIAM:

This case is before the Court upon the appeal of the 4–H Road Community Association from the February 17, 1988 order of the Circuit Court of Monongalia County on cross motions for summary judgment. The appellant contends that the trial court erroneously granted summary judgment in favor of the appellee, the West Virginia University Foundation (Foundation) by finding that based on the evidence in the record, the Foundation was neither created by state authority nor primarily funded by state authority and therefore is not a "public body," under *W.Va.Code*, 29B–1–2(3) [1977], subject to the West Virginia Freedom of Information Act, 29B–1–1 to 29B–1–6 [1977] (the West Virginia FOIA).[1] We affirm.

---

**1.** As a charitable organization, the Foundation is subject to the provisions of the Solicitation of Charitable Funds Act, *W.Va.Code,* 29–19–1 to 29–19–16, as amended, the purpose of which "is

to protect the people of the state ... by requiring full public disclosure by persons and organizations who solicit funds from the public and the purposes for which such funds are solicited

In August, 1977, the appellant, pursuant to the West Virginia FOIA, requested that the Foundation provide it copies of certain documents pertaining to coal leases to which it holds legal title. Its president, James A. Robinson, denied the request, contending that the Foundation is a private, not-for-profit corporation created for the purpose of assisting West Virginia University (the University), primarily through fund raising, and is not a "public body" subject to the disclosure provisions in the West Virginia FOIA.

Pursuant to the procedures outlined in *W.Va.Code*, 29B–1–5 [1977], the appellant sought declaratory and injunctive relief in the Circuit Court of Monongalia County, alleging that the Foundation is a "public body" and seeking disclosure of the documents under the FOIA provisions.

The purpose of the West Virginia FOIA is to provide "information regarding the affairs of government and the official acts of those who represent them as public officials and employees.". *W.Va.Code*, 29B–1–1 [1977]. To achieve this purpose, the West Virginia FOIA mandates public inspection and copying of the records of a public body. *W.Va.Code*, 29B–1–3(1) [1977].

A "public body" is defined in *W.Va.Code*, 29B–1–2(3) [1977] to mean:

every state officer, agency, department, including the executive, legislative and judicial departments, division, bureau, board and commission; every county and city governing body, school district, special district, municipal corporation, and

any board, department, commission, council or agency thereof; *and any other body which is created by state or local authority or which is primarily funded by the state or local authority.*

(emphasis added).

The appellant contended that the Foundation is a "public body," because it was created by state authority or, in the alternative, that it is primarily funded by state authority.

The following information concerning the Foundation was provided to the court prior to its ruling on cross motions for summary judgment.

The Foundation was chartered as a charitable, educational, not-for-profit corporation, pursuant to the predecessor to the current general corporate laws of the state, *W.Va.Code*, 31–1–136 to 31–1–158, as amended, on December 3, 1954, by eleven private citizens. Its purpose, as set forth in its corporate by-laws, is to "aid, strengthen and further in every proper and useful way the work and service of West Virginia University."

By statute, any gift made directly to the University, a public institution, must be paid directly into the State Treasury and held in a special account. *W.Va.Code*, 12–2–2(c) [1983]. In contrast, under its corporate by-laws, the Foundation, manages and holds legal title to only those donations made directly to the Foundation. Foundation support for the University, though extensive, is not a budgeted item of the University.[2]

---

and how they are actually used, and to prevent deceptive and dishonest statements and conduct in the solicitation and reporting of funds for or in the name of charity." *W.Va.Code*, 29–19–1a [1986]. As such, the Foundation is annually required to file a financial statement with the Secretary of State which includes, among other things:

[A] balance sheet and income and expense statement for the organization's immediately preceding fiscal year, or a copy of a financial statement covering, in a consolidated report, complete information as to all the preceding year's fund-raising activities of the charitable organization, showing kind and amount of funds raised, costs and expenses incidental thereto, and allocation or disbursement of funds raised[.]

*W.Va.Code*, 29–19–5(a)(6) [1986]. The financial statement also requires the organization to disclose "[t]he general purpose or purposes for which the contributions to be solicited shall be used[.]" *W.Va.Code*, 29–19–5(a)(10). The information is a matter of public record and open for public inspection in the Secretary of State's office. *W.Va.Code*, 29–19–10 [1977].

2. To provide some sense of the nature and magnitude of the endeavor, the Foundation's 1985 federal income tax returns, which were filed as a charitable, tax exempt organization, indicate that it collected roughly $17 million, and after operating costs, it disbursed over $12 million to the University ($2.1 million "student support," $8.9 million "departmental and faculty support,"

Its Board of Directors consists of 38 private citizens and one *ex officio* member, who is employed by the state, the president of the University. The president serves by reason of the corporate by-laws, not by legislative mandate. Employees are paid by the Foundation and do not participate in any state benefit or wage payment plans. The Foundation owns its headquarters and is not located on the campus of the University. The by-laws of the Foundation allow it to sue or be sued and its debts are limited to its assets.

One of the documents in the record is a 1984 Board of Regents memorandum entitled "policy statement" regarding gifts to the University, which outlines the manner the University's needs are coordinated with the Foundation's fund raising efforts.[3] The purpose of the Board of Regent's policy statement was to "promote the maximum return from the solicitation of gifts [by avoiding] disruptive and embarrassing competition among the several schools, colleges and units of the University." In listing the roles of all the parties, the Board of Regents referred to the Foundation as "the primary gift solicitation agency for West Virginia University."

Based on all the evidence, the trial court granted summary judgment in favor of the Foundation, concluding that it is not a public body, within the meaning of *W.Va.Code,* 29B–1–2(3) [1977], as it was neither created by state authority nor primarily funded by state authority, and therefore is not subject to the disclosure requirements of the West Virginia FOIA.[4]

The appellant contends that the trial court erred when it concluded that the Foundation is not a public body because it was not created by state authority. The appellant relies exclusively on the 1984 Board of Regents policy statement whereby the Board referred to the Foundation as "the primary gift solicitation agency" for the University and the fact that the University president serves as an *ex officio* member of the Foundation's board of directors.

In *Queen v. West Virginia University Hospitals, Inc.,* 179 W.Va. 95, 365 S.E.2d 375 (1987), we addressed whether the West Virginia University Hospitals (WVUH), a corporation formed to manage a hospital located on University property, was a "public body," subject to the West Virginia FOIA provisions.[5] In that case, the sole

---

$391,000 "general University support," $689,000 "returns and allowances.")

**3.** Pursuant to *W.Va.Code,* 18–11–1 [1947], the Board of Regents was created for "the general control, supervision and management of the business and educational affairs" of West Virginia University and Potomac State College. Title to all property for the institutions was held by the Board of Regents. *W.Va.Code,* 18–11–1a [1947]. In 1989 the Board of Regents was abolished and all powers and duties of the Board of Regents were transferred to the individual colleges and universities' boards of trustees or boards of directors. *W.Va.Code,* 18B–1–3 and – 4 [1989].

According to the policy statement, each department of the University is asked by the University to target its future needs (e.g., endowment of a chair, building repair, etc.). The departmental recommendation is forwarded to a University liaison committee, which is "appointed by the President [of the University and] chaired by the [University's] Vice President for Institutional Advancement." The President of the Foundation serves as an *ex-officio* member of the committee. The liaison committee places the recommendations in priority. Those departmental recommendations approved by the liaison committee are then presented to the Foun-

dation, which reviews the targeted future needs of the University, and determines if it is able to coordinate its fund raising activities to meet the targeted future needs.

**4.** The trial court also noted in the order that:

[A] substantial number, if not all, of the documents requested by the plaintiff from the defendant Foundation relating to the coal lands in question and including the lease in question are, in fact, actually in the *possession* of West Virginia University; and that all such documents are in fact and in law *public records* .... As public records, any documents in West Virginia University's possession must be made available to the plaintiff upon request from the University.

**5.** As indicated in *Queen v. West Virginia University Hospitals, Inc.,* 179 W.Va. 95, 102, 365 S.E.2d 375, 382 (1987), the FOIA statutes of the various states differ materially in their definitions of a "public body." Only two other jurisdictions, Kentucky and Michigan, have statutes which use the language "created by state authority" as contained in *W.Va.Code,* 29B–1–2(3) [1977]. *Queen,* 179 W.Va. at 102 n. 3, 365 S.E.2d at 382 n. 3. These jurisdictions have yet to interpret the provision; therefore, as in

issue before the Court concerning the West Virginia FOIA statute was whether the trial court properly determined that the WVUH was created by state authority under *W.Va.Code*, 29B–1–2(3) [1977] and was therefore subject to the disclosure provisions of the statute. *Queen*, 179 W.Va. at 102, 365 S.E.2d at 382.[6]

Although the WVUH was incorporated under the general corporate provisions of state law, it was incorporated as such only after the legislature mandated its creation. *W.Va.Code*, 18–11C–1 to 18–11C–10 [1984]. *See Queen*, 179 W.Va. at 98, 365 S.E.2d at 378. Under the statute, the former Board of Regents was authorized to transfer the public hospital's assets to the proposed corporate entity that had "statutorily specified purposes and directors [appointed by the Governor and subject to Senate confirmation], primarily public officers [nine of the eighteen directors served by virtue of their positions with the Board of Regents or the University Hospital], who have fiduciary duties to the people of the State of West Virginia [prohibition of mortgaging, public conflict of interest statements and public audits, as mandated in the enabling legislation]." *Queen*, 179 W.Va. at 99, 365 S.E.2d at 379. The statute further provided that the hospital employees of the former Board of Regents were to remain employed by the corporation without becoming employees of the corporation. *Id.*

*Queen*, we do not consider the authorities interpreting the dissimilar statutes to be persuasive.

6. *Queen* concerned two consolidated cases involving WVUH. The two cases were factually related, yet required two different types of analysis. One case, that which controls the issues before the Court today, concerned a trial court ruling that WVUH is a "public body" under the West Virginia FOIA statute, and, therefore, the State Attorney General was entitled to obtain certain documents from the institution.
The other case before the Court concerned whether Queen, an employee of the WVUH was entitled to procedural due process prior to termination. Since procedural due process is required of the State, but not of private persons, we were required, in Queen's instance, to determine if WVUH could be considered a "state actor" for procedural due process purposes. *Queen*, 179 W.Va. at 103, 365 S.E.2d at 383.

■ In syllabus point 3 of *Queen*, 179 W.Va. 95, 365 S.E.2d 375, we held that: "As a general rule, the general corporation law is the law under which private corporations are organized." However, we upheld the trial court's ruling that the entity, though incorporated under the general corporate laws of the state, was nonetheless a "public body" as defined in *W.Va.Code*, 29B–1–2(3) [1977] because *W.Va.Code*, 18–11C–1 to 18–11C–10 [1984] represented "the transfer of assets from one mandated entity—the [Board of R]egents—to another mandated entity—WVUH[.]" *Queen*, 179 W.Va. at 99, 365 S.E.2d at 379. "Unlike the normal corporate entity, the statute was the *sine qua non* leading to the incorporation of WVUH and that body was, therefore, created by state authority." *Queen*, 179 W.Va. at 102, 365 S.E.2d at 382.

■ In the case before the Court today, the Foundation was formed by private citizens pursuant to the general corporate laws of the state. No legislative mandate for such an entity predated its incorporation. It is not located on state property; does not utilize state employees; and selection of its Board of Directors, and their duties, are governed by the corporation's by-laws. While the president of the University serves on the Board of Directors of the Foundation, the president serves by virtue of the Foundation's by-laws, rather than legislative mandate, and serves in an *ex officio* capacity.[7]

As indicated in syllabus points 8 and 9 of *Queen*, *supra*, the analysis for determining whether an entity is a state actor for purposes of determining entitlement to procedural due process, differs from the analysis for determining whether an entity is within the definition of a "public body" under the West Virginia FOIA statute. Syl. pt. 3, *Queen*. The West Virginia FOIA statute does not indicate that close interaction of the state and the private entity, alone, would mean that the private corporation is a "public body."

7. Appellant contends that the fact that the President of the University sits as an *ex officio* member of the Foundation serves as evidence that the Foundation was created by state authority under *W.Va.Code*, 29B–1–2(3) [1977]. This contention has no merit. Appellant relies on *North Central Association of Colleges and Schools v. Troutt Brothers, Inc.*, 261 Ark. 378, 548 S.W.2d

Thirty years after its incorporation, the Board of Regents, in an effort to coordinate fund raising activities, referred to the Foundation as the University's "primary gift solicitation agency." While this statement may be accurate, it is not tantamount to state authorization for the creation of the entity. To assume such would require a court to ignore the Foundation's thirty prior years of existence. It is also important to note that the policy statement also acknowledged that the University does not exercise any control over the Foundation's decision to commit its fund raising efforts to those activities selected by the University.

■ The disclosure provisions of the West Virginia FOIA are required to be liberally construed to serve the public purpose of the statute. Syl. pt. 1, *Daily Gazette Co. v. Withrow*, 177 W.Va. 110, 350 S.E.2d 738 (1986). However, even in light of such liberal construction, the trial court properly concluded that the Foundation is not a "public body" subject to the West Virginia FOIA, because it was not created by state authority. The record amply supports this determination of the trial court.

The appellant, without citing any authority in its brief, also contends that the Foundation is "primarily funded" by state authority and is, therefore, a public body. The appellant argues that "[o]nly because individuals have chosen to give money to a public institution does the Foundation have a dime[.]"

The money donated to the Foundation is nonetheless garnered from private individuals. Unlike *Queen*, there is no evidence in the record indicating that public money, property or employees are in any way used for the operation of the Foundation. In its brief, the appellant also asserts that the Foundation "owns" or "will own" a "facilities building" located on University property and, to this extent, state funds have been expended in a manner similar to *Queen*, where the corporation operated on University property. The evidence in the record clearly indicates that the state has always held legal title to the property. The property was leased to the Foundation, for a nominal amount over a three-year period, during which time the "facilities building" was constructed. The leasing arrangement in this case solely benefitted the University, not the Foundation. Through the leasing arrangement, the University obtained a "facilities building" funded through a combination of revenue bonds and private donations.[8] In other instances, we have held that such public-private cooperation does not affect the otherwise private corporation's status as such. *See* syl. pt. 1, *Woodord v. Glenville State College Housing Corp.*, 159 W.Va. 442, 225 S.E.2d 671 (1976).

Based upon the foregoing, we affirm the trial court's conclusion that the Foundation

---

825 (1977), where an employee of the Arkansas Department of Education sat as the chairman of a private, statewide association. However, the Arkansas court noted that the chairman's secretary performed services for the association, and over 90% of the funding for the association came from the public member institutions. Further, the association's official location was on public property. In a statute dissimilar to our statute, *see supra* note 5, the court found that the association was sufficiently supported by public funds to render it subject to the state FOIA provisions.

8. In order to fully finance the construction of the building, the Board of Regents leased the proposed site for the "facilities building" to the Foundation for $1.00 per year. The Foundation, in turn, constructed the facility and paid for it through both private contributions and rental fees. The rental fees were provided by the Board of Regents, which apparently leased

back the building. The Board of Regents paid the rental fees with special gate receipt revenue bonds. When the bonds were paid in full, in 1983, the lease of the site expired. *See* "Revenue Bonds for West Virginia University Athletic Facilities," *W.Va.Code*, 18–11D–1 to 18–11D–15 [1984], permitting the issuance of gate receipt revenue bonds for "financing the cost of ... [c]onstructing ... the ... facilities building[.]" *W.Va.Code*, 18–11D–1(b) [1984].

During the three-year period that the proceeds from the special gate receipt revenue bonds were used to pay the lease on the building, the Foundation was included on the state's insurance policy. However, coverage was limited to potential liability regarding the "facilities building," since the bonds used to pay the lease named the Foundation as obligor. *See W.Va. Code*, 18–11D–1(f)(1)–(5) [1984].

is not a "public body" subject to the FOIA provisions of *W.Va.Code,* 29B–1–1 to 29B–1–6 [1977], because it was not created by state authority, nor is it primarily funded by state authority. *W.Va.Code,* 29B–1–2(3) [1977].

Affirmed.